IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| A2 SALES, LLC, d/b/a } | |
| ALLIANCE STEEL, LLC., } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | Case No.:  2:09-CV-14-JHH |
| } | |
| THE KENT CORPORATION, INC., } | |
| } | |
| Defendant. } | |

## MEMORANDUM OPINION

On October 13, 2010, the court held a bench trial in this case for the purpose of determining whether a contract was formed between Plaintiff A2 Sales, LLC d/b/a Alliance Steel, LLC ("Alliance") and Defendant The Kent Corporation, Inc. ("Kent") for the purchase of steel. After Alliance rested its case in chief, The Kent Corporation moved for judgment as a matter of law arguing that the testimony revealed no dispute that Kent's Purchasing Buyer did not have actual, apparent, or implied authority to bind Kent to the purchase of steel without approval from corporate officers.  (Doc. #57 at 138, 143).  The court heard oral argument and thereafter the parties were directed to brief the narrow issue of implied or apparent authority.  (*See* Doc. #52).  The briefs are have been filed (*see* Docs. #53-56), and the motion for judgment as a matter of law is currently before the court for review.

I.   **PROCEDURAL HISTORY**

Plaintiff Alliance commenced this action on January 6, 2009 by filing a single action complaint (Doc. #1) in this court for breach of contract.  Defendant Kent filed a Motion for Summary Judgment (Doc. #16) on January 29, 2010 alleging, *inter alia*, that its Purchasing Buyer

had no authority to bind the company to the purchase of steel. The motion for summary judgment was denied by the court on March 15, 2010 (*see* Doc. #31) because of numerous factual disputes. The parties were directed to mediation, which failed (*see* Doc. #32), and thereafter the parties proceeded to bench trial (*see* Docs. #52, 57). The bench trial culminated in the motion for judgment as a matter of law which is currently before the court for review. (*See, e.g.,* Doc. #54 at 6-7).

Each party has filed briefs in support of their respective positions concerning the issue of actual or implied authority. On November 4, 2010, memorandum briefs (*see* Docs. #53, 54) were submitted. On November 11, 2010, reply briefs (*see* Docs. #55, 56) were submitted. Based on the below findings of fact and conclusions of law, the court finds that The Kent Corporation did not breach any contract with A2 Sales LLC, d/b/a Alliance Steel, LLC and that Kent is entitled to judgment as a matter of law as to all claims asserted against it by Alliance.

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Findings of Fact

1. The Kent Corporation has been in the business of manufacturing retail-type shelving since approximately 1958. (See Doc. #47, ¶ 4; *see also* Doc. #57 at 62).[1]

2. Kent's business operations require it to purchase steel from various vendors. (*See* Doc. #47, ¶ 1).[2]

3. One of those vendors has historically been A2 Sales LLC, d/b/a Alliance Steel, LLC. Alliance does not manufacture steel but obtains steel from mills to meet customers' needs. (Doc. #57 at 101-102). Alliance prices steel based on costs. "Those costs are determined by published mill pricing, announced mill pricing. We add those costs on top of any processing, any scrap generated, any freights involved, and then we determine a margin and quote the price." (Doc. #57 at 102).

---

[1] This is one of the parties' agreed findings of fact.

[2] *See* footnote 1, *supra*.

4. Kent is owned by M.A. Oztekin ("Oztekin"). (*See* Doc. #47, ¶ 2).[3]

5. M.A. Oztekin serves as President and CEO of Kent. (*See* Doc. #47, ¶ 3).[4]

6. Sharon Harbison ("Harbison") is Kent's treasurer and corporate secretary, and has worked at Kent for over nineteen years. (*See* Doc. #47, ¶¶ 5, 7).[5]

7. Harbison supervises all account related departments, including purchasing. (*See* Doc. #47, ¶ 6).[6]

8. Sterling Hicks ("Hicks") was the Purchasing Buyer for Kent from 1986 until approximately October 2008. (*See* Doc. #47, ¶ 8; *see also* Doc. #57 at 61, 62).[7]

9. In his position as Purchasing Buyer, Hicks placed orders for steel when Kent's manufacturing department so requested. (Doc. #57 at 62).

10. Throughout his tenure at Kent, Hicks purchased numerous orders of steel in three month quantities to fill Kent's needs, and then took deliveries of that steel over the three month period. (Doc. #57 at 11-17, 63).

11. Salesmen desiring to sell steel to Kent would deal solely with Hicks, and would have no reason to contact Harbison or Oztekin. (Doc. #57 at 70, 91, 103).

12. Andy Stewart ("Stewart") was Alliance's senior sales representative in June 2008. (Doc. #57 at 5). He held that position for a year and a half. (*Id.*).

13. Stewart's job was to sell steel to end users, such as Kent.[8] (Doc. #57 at 6).

---

[3] *See* footnote 1, *supra*.

[4] *See* footnote 1, *supra*.

[5] *See* footnote 1, *supra*.

[6] *See* footnote 1, *supra*.

[7] *See* footnote 1, *supra*.

[8] Stewart had sold steel to Kent in the position he held with his former employer. (Doc. #57 at 6).

14. To accomplish that, Stewart would call Kent and ask for the steel buyer and would be connected to Sterling Hicks.[9] (Doc. #57 at 7, 8). Stewart never dealt with anyone at Kent other than Sterling Hicks for the purchase of steel.[10] (Doc. #57 at 7).

15. In June 2008, Hicks contacted Stewart, and asked Alliance for a price quote for 600 tons of steel to be delivered to Kent in July, August, and September 2008. (Doc. #57 at 5-6, 8).

16. The price of steel was high in the summer of 2008 and customers were trying to lock in prices because there was speculation that steel prices would continue to rise. (Doc. #57 at 10-11).

17. Stewart provided a quote to Hicks in the form of a document styled "Order Confirmation." (Doc. #57 at 11). Order Confirmations are done for the purpose of locking in prices. (Doc. #57 at 11).

18. Hicks understood the Order Confirmation to be "saying that the price was correct and if they [Alliance] wanted to go out and buy the steel, that's their choice." (Doc. #57 at 63-64).

19. The Order Confirmation was for 600 tons of steel at a price of $65.95 per hundred pounds of steel delivered. (Doc. #57 at 14, 16).

20. Hicks signed the Order Confirmation and faxed it back to Stewart. (Doc.#57 at 12, 17, 23). The Order Confirmation was never signed, initialed, or approved by Oztekin or Harbison. (Doc. #57 at 39, 89, 98). In fact, Alliance's office manager informed Alliance that the Order Confirmation at issue here was not an order, but rather "a commitment on specs, purchase orders to follow." (Doc. #57 at 130-131).

21. This was the one instance in which Hicks did not get written authority from superiors at Kent; he forwarded the Order Confirmation to Stewart assuming that Kent would subsequently give him authority to purchase the steel because they had in the past. (Doc. #57 at 88-91, 140).

22. Stewart testified that he did not know if Hicks got approval from a Kent officer before returning the order confirmation to Stewart. (Doc. #57 at 18, 37). "Mainly

---

[9] As Stewart knew that steel would be needed by Kent, he would call Hicks and "put a price together based on the mill . . . and send [Hicks] documentation with the pricing, and [Hicks] would either approve it or not, and if he did approve it, he would sign it and send it back to me." (Doc. #57 at 9).

[10] Stewart did, however, deal with other officers of Kent on quality issues. (Doc. #57 at 7-8).

  if Sterling's [Hicks] signature was on there, I felt like the order was as good as gold." (Doc. #57 at 58). "I had no reason to believe that he [Hicks] was not the guy that ordered steel." (Doc. #57 at 18). However, Stewart admitted that other documents evidencing consummated steel purchase transactions between Alliance and Kent were all signed or initialed by Harbison or Oztekin. (Doc. #57 at 48-51).

23. Stewart's testimony at trial (that he did not know that Hicks lacked unilateral authority to purchase steel on behalf of Kent) directly contradicted his August 17, 2009 deposition testimony. During his deposition, Stewart testified that Hicks told him that steel purchases by Kent had to be approved by Sharon Harbison, Kent's Vice President. (Doc. #57 at 38-39). In fact, on direct questioning in his deposition, when asked: "but you knew from Hicks that every order had to be approved by either Sharon or Mr. Oztekin as an officer of the corporation?", Stewart responded "correct." (Doc. #57 at 38-39).[11]

---

[11] Stewart also advanced the following testimony at trial:

Q: And isn't it true that every purchase order that Kent Corp. had issued to any company that you have worked for had either been signed or initialed by either Sharon Harbison or M.A. Oztekin?

A: I know there were some by Sterling, and I know now that there were initials that some are legible and some are not that I understand after all this happened where Sharon or Mr. Oztekin, I guess, signed these.

(Doc. #57 at 39).

Q: And you remember at your deposition when y'all reviewed those just to save time that each and every one of them was either signed by Sharon Harbison, signed by M.A. Oztekin, or initiated by one of the two of them, correct?

A: Again, after the fact, yes, but some of these initials you can't even read what it is.

(Doc. #57 at 43).

Q: All of them [purchase orders] at least have a signature counter signing Sterling Hicks' signature, correct?

A: There is – it looks like somebody did try to sign, yes.

(Doc. #57 at 50).

 That Stewart's testimony contradicts itself "create[s] an issue of credibility or go[es] to the weight of the evidence." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (7th Cir. 1986). The court, sitting as the trier of fact in the bench trial, finds that Stewart knew, or at minimum should have known, that Hicks needed final approval from Harbison or Oztekin to make a sale final.

24. Hicks never represented to Stewart or anyone at Alliance that the Order Confirmation was a contract to purchase steel. (Doc. #57 at 80-81).

25. Hicks testified that he told Stewart on multiple occasions that he did not have authority to buy steel.[12] (Doc. #57 at 76-77, 85).

26. Hicks told Stewart that purchase orders for the purchase of steel that were written up and prepared by Kent had to be approved in writing by Oztekin or Harbison. (Doc. #57 at 77, 83).

27. Hicks explained to Stewart that when Kent issued a confirmation order, all that meant was that Alliance could keep the steel in inventory and Kent may or may not buy it at a later date. (Doc. #57 at 78). This was a safety mechanism for Kent in case the price of steel went down prior to approval. (Doc. #57 at 78-79, 89).

28. Hicks never put into writing to vendors his lack of authority to purchase steel. (Doc. #57 at 99). None of Kent's vendors were given any documents that would inform the vendor that they needed to seek the approval of a Kent officer before a contract could be executed. (Doc. #57 at 91).

29. In July 2008, Stewart sent Harbison a copy of the Order Confirmation referenced above by fax. (Doc. #57 at 24, 35-36). "She and I had a conversation that she thought that there was no order." (*Id.*). At that time, Harbison told Stewart that Hicks was not authorized to buy steel on behalf of Kent. (Doc. #57 at 26).

30. At the time Stewart had that conversation with Harbison, it was too late for Alliance to cancel the order. (Doc. #57 at 26, 115). Kent took delivery of "very little" of the steel referenced in the Order Confirmation. (Doc. #57 at 29).

B. **Conclusions of Law**

As was the case on summary judgment, at trial the central issue to be determined was whether Kent and Alliance entered into a contract for Kent to purchase steel from Alliance. (*See* Doc. #31 at 5; *see also* Doc. #40). To establish a breach of contract, a plaintiff must prove: (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the

---

[12] An affidavit signed by Hicks, and in evidence before this court, says that Hicks had authority to buy steel to bind Kent. (Doc. #57 at 85). However, at the trial, Hicks recounts the affidavit statement and says that the statement on authority "was supposed to be stricken out." (Doc. #57 at 93-94, 97). The court found Hicks' trial testimony to be credible.

contract, (3) the defendant's nonperformance, and (4) damages. *See State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 303 (Ala. 1999). The only one of those elements in dispute here is the first. Alliance contends that the written Order Confirmation signed solely by Hicks for the sale of steel constitutes a valid contract; Kent contends that the Order Confirmation is not a contract because Hicks did not have actual, apparent, or implied authority to bind Kent to the purchase of steel.[13] (*See generally* Doc. #40).

It is well settled that whether parties have entered into a contract is determined by reference to the reasonable meaning of the parties' external and objective actions. *See SGB Constr. Servs., Inc. v. Ray Sumlin Constr. Co.*, 644 So.2d 892, 895 (Ala. 1994). Even in the absence of an express communication of acceptance, conduct of one party to a contract from which the other may reasonably draw an inference of assent to an agreement is as effective as acceptance. One way for this to happen is for an agent with actual or apparent authority to bind his principal. *See Cook's Pest Control, Inc. v. Rebar*, 852 So.2d 730, 738 (Ala. 2002) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kilgore*, 751 So.2d 8, 11 (Ala. 1999); *Lee v. YES of Russellville, Inc.*, 784 So.2d 1022 (Ala. 2000)). To be clear, it is on that authority that Alliance hangs its hat. *See Ex parte Steadman*,

---

[13] Although Kent has advanced additional arguments for defending the breach of contract claim, such as – the quote for the purchase of steel did not contain all the necessary terms to form a contract such as signature and specifications; Kent did not ratify the order confirmation; the goods provided by Alliance were nonconforming (*see* Doc. #47 at 17-21) – the only issue remaining to be resolved after the bench trial on the motion for judgment as a matter of law is whether Sterling Hicks had apparent or implied authority on behalf of Kent to enter into a contract for the sale of steel with Alliance. (Doc. #57 at 138-139, 143) ("Our argument is that it's undisputed from Sterling Hicks and from Andy Stewart that both of them knew that they had to have the authority, written authority from an officer of the company, Miss Harbison or Mr. Oztekin, on the question – for there to be a binding agreement or binding commitment . . . [T]he main thing I think this Court has to look at, did Sterling Hicks have implied authority, actual authority – and Mr. Stewart had to testify by way of deposition, which we read into the record, that he knew that for Kent to be approved by any contract, it had to be approved by Sharon Harbison or Mr. Oztekin.").

812 So.2d 290, 294 (Ala. 2001) (citing *Mardis v. Ford Motor Credit Co.*, 642 So.2d 701, 704 (Ala. 1994)) (noting that the party asserting agency has the burden of presenting sufficient evidence to prove the existence of agency).

"Apparent authority of an agent arises from the acts of the principal, either by omission or commission, and such authority is implied where the principal passively permits the agent to have authority to act on his behalf." *Buchanan v. Collier*, 555 So.2d 134, 136 (Ala. 1989); *see also Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc.*, 426 So.2d 859, 861 (Ala. Civ. App. 1983) and *Rosser v. AAMCO Transmissions, Inc.*, 923 So.2d 294, 300 (Ala. 2005) (stating that the relevant inquiry is based upon the actions of the principal, not those of the agent).[14] "As between the principal and third persons, mutual rights and liabilities are governed by the apparent scope of the agent's authority which the principal has held out the agent as possessing, or which he has permitted the agent to represent that he possesses and which the principal is estopped to deny. Such apparent authority is the real authority so far as affects the rights of a third party without knowledge or notice. When one has reasonably and in good faith been led to believe, from the appearance of authority which a principal permitted his agent to exercise, that a certain agency exists, and in good faith acts on such belief to his prejudice, the principal is estopped from denying such agency." *Union Oil Co. of Cal. v. Crane*, 258 So.2d 882, 885 (Ala. 1972) (internal citations omitted); *see also Cook's Pest Control, Inc. v. Rebar*, 852 So.2d 730, 738 (Ala. 2002) ("Furthermore, a principal may vest his agent with apparent authority to perform an act by omission as well as commission, and such authority is

---

[14] This statement of the law is one of the parties' agreed conclusions of law. (Doc. #47 at 11, ¶ 1).

implied where the principal passively permits the agent to appear to a third party to have the authority to act on his behalf.").

The case law, when considered in conjunction with the testimony from trial, makes clear that Sterling Hicks did not have apparent or implied authority to unilaterally bind his employer, the Kent Corporation, for the purchase of steel. Hicks himself has repeatedly admitted that despite the fact that he held the position of Purchasing Buyer, he could not buy steel from vendors without approval from his superiors.[15] (Doc. #57 at 76-78, 85). With regard to the Order Confirmation at issue in this case, Hicks admits that he returned it to Alliance *without* the approval of his superiors, instead *assuming* that Kent would later give him authority to make the purchase, simply because they had done so in the past. (Doc. #57 at 39, 88-91, 98, 140).

But Kent never led Hicks, or anyone dealing with Hicks, to believe that he could bypass the system of gaining approval from superiors before finalizing the purchase of steel. (Doc. #57 at 70, 91). Every purchase order actually consummated with Alliance bore the signature or initials of Oztekin or Harbison (in addition to those of Hicks). (Doc. #57 at 76-77, 80-81, 83, 84-85). And it was no secret that such approval was necessary. *See Perry v. Meredith*, 381 So.2d 649, 650 (Ala. Civ. App. 1980). Hicks informed Stewart, on several occasions, of his inability to unilaterally bind Kent for the purchase of steel. (Doc. #57 at 38-39, 76-77, 80-85). That Stewart may have actually believed that Hicks' signature was "good as gold" (*see* Doc. #57 at 58) is not enough to bind Kent for the purchase of steel. Mere belief of authority without cause, or belief in the face of facts that

---

[15] In fact, Hicks testified that he believed his inability to act unilaterally detracted from the effectiveness of his position as Kent's Purchasing Buyer. (Doc. #57 at 88) ("I left Kent because it was going to the fact that there would be no trust or . . . my usefulness as a purchasing agent would be completely questioned all the time . . . [w]ith respect to buying steel, committing orders for steel, whether or not I was doing the correct job, whether or not I was doing the correct procedures.").

should have put Stewart on guard that Hicks did not have absolute authority is simply not enough. *See Brown v. St. Vincent's Hosp.*, 899 So.2d 227, 241 (Ala. 2004) ("[A] party relying on apparent agency 'must show that he was misled by the appearances relief upon. It is not enough that he might have been so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on guard is not enough.'") (internal citations omitted).

Alliance's senior sales representative had multiple reasons to be on guard that Hicks' signature alone was not sufficient to consummate the sale of steel. Not only did Hicks inform Stewart of the situation within which he worked on several occasions, but the Kent Corporation never acted in a way to hold Hicks out as having authority to act unilaterally. *See Malmberg v. Am. Honda Motor Co.*, 644 So.2d 888, 891 (Ala. 1994). Quite to the contrary, every action of the principal evidenced its refusal to sit passively by and let its Purchasing Buyer have unfettered authority to bind the company. *See Cook's Pest Control, Inc. v. Rebar*, 852 So.2d 730, 738 (Ala. 2002); (*See also* Doc. #57 at 85-87). Therefore, Kent cannot be bound by its agent for the purchase of steel that is the subject of this lawsuit.

## III.   CONCLUSION

For the foregoing reasons, The Kent Corporation, Inc. is entitled to judgment as a matter of law as to all claims asserted against it by A2 Sales, LLC d/b/a Alliance Steel, LLC. A separate order will be entered.

**DONE** and **ORDERED** this ___2nd___ day of February, 2011.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE